JOSEPH H. ALSTON, *et al.*, APPELLANTS, vs. SARAH F. ROWLES, EXECUTRIX OF THE LAST WILL OF JOHN J. ROWLES, DECEASED, IN BEHALF OF, ETC., APPELLEES.

1. Where property is purchased and paid for by the husband, and a deed is taken in the name of the wife, such acts coupled with an existing indebtedness of the husband make a prima facie case of fraud. In such case the creditor can follow the funds of the debtor and subject the property in the hands of the wife or her legal representatives, unless the presumption of fraud is negatived by the condition of the debtor and his circumstances at the time, or other rebutting evidence.

2. The rule at common law is that the goods and personal chattels of the wife, which were actually beneficially possessed by her in her own right at the time of her marriage, and such other goods and personal chattels as come to her during coverture, vest absolutely in the husband. The separate property of the wife is that of which she has the exclusive

Alston vs. Rowles—Argument of Counsel.

control, independent of her husband, and the proceeds of which she may dispose of as she pleases.

3. Where a gift of personal property to the wife during coverture is established, it is presumed, in the absence of testimony to the contrary, to be a gift as her general and not her separate property. In a contest between creditors of the husband and creditors of the wife, it devolves upon the creditors of the wife seeking to establish a separate estate in property acquired prior to 1845, to show that the gift was accompanied by some instrument or unequivocal declaration to the effect that it was to and for the separate use of the wife, free from the control of the husband.

4. Where a husband purchases real estate, taking the deed in the name of his wife, his declaration that the purchase is made as the agent of his wife, and that the money paid is his wife's, is not sufficient to establish a purchase with funds belonging to the separate estate of the wife.

5. *Held*, (by a majority of the Court,) that the representatives of a deceased partner stand in the relation of a creditor of the surviving partner, who assumes control of the partnership effects, to the extent of the value of the interest of the deceased partner after satisfying the partnership debts; and the doctrine that a voluntary gift or conveyance, or a voluntary post-nuptial settlement by a person indebted, is *prima facie* fraudulent as to the creditors of the debtor, applies as well in behalf of the representatives of the deceased partner, as in behalf of general creditors.

This is another appeal in the preceding case prosecuted by the defendants in the circuit court. The first appeal being dismissed, the suit was subsequently revived in the circuit court by the legal representatives of the deceased defendants. There being no amendment of the pleadings, the case brought up by this appeal is identical with that brought by the previous appeal, so far as the issues are concerned. There was additional testimony taken in the circuit court upon the revival of the suit. All of the testimony pertinent to the several issues raised by the bill and answer is stated by the court in its determination of the issues in the order in which they are considered.

*S. J. Douglas*, for Appellants.

The evidence in this case shows that Mary Berry had, during the coverture, made large sums of money by her in-

dividual exertions and industry as milliner and mantua-maker. It further shows that she received from Lowell Holbrook a large amount of property as a gift to her separate use.

It is contended by appellants that this property was protected by the laws of this State from the marital rights of the husband while alive, and from his creditors after his death, and that in a court of equity the husband would be held to be the trustee of the wife. 2 Fonbl. Eq., book 1., ch. 2, sec. 6, note a; 2 Roper on husband and wife, ch. 18, p. 151 to 157; 9 Vesey, jr., 583; 2 Roper on Legacies, (by White) ch. 21, sec. 5, p. 370; 2 Pr. Wm., 316; 1 Atk. Rep., 270; 3 John. Ch. Rep., 540.

In such cases, the husband will be held trustee for the wife, although the agreement is made between *him and her alone*, and the trust will attach and be enforced in the same manner and under the same circumstances that it would be if he were a mere stranger. 2 Kent's Com., 146; 8 Yer. Rep., 33; 2 Carr & Payne, 62; 4 Myl. & Cr., 408; 4 Mason's C. C., 455; 4 McCord Rep., 452; 3 Gill & John. Rep., 504; 10 Pet. Sup. Ct. Rep., 583.

By the statute laws of this State, a married woman may acquire a separate estate, both real and personal, during coverture, by bequest, demise, gift, purchase, &c., and it is protected from the marital rights of the husband and the claims of the creditors, if an inventory thereof be made and recorded within six months from the time the title vests in her; and the registration of the deed of real estate is a compliance with the requirements of the statute. 5 Fla., 279. The presumption of law, in the absence of proof to the contrary, is that the purchase money was paid by the party to whom the title was made.

The appellants contend that a *gift* from husband to wife during coverture is good and valid, and will be supported as a post-nuptial settlement, without the intervention of a trustee, if it be not prejudicial to the rights of creditors.

In order to invalidate a *gift* from the husband to the wife, made during the coverture, on the ground that it was *voluntary*, the bill must not only allege that the husband was indebted at the time of the gift, but the *proofs* must not only establish this fact, but also the further fact that the husband had not at the time of the gift sufficient remaining property to pay and discharge his then indebtedness. 2 Douglas' Mich. Rep., 326.

The circumstance that the property thus conveyed to the wife constituted a large portion of the estate of the grantor, but that he *failed* within a short period after the date of the conveyance, may awaken suspicion and strengthen other circumstances, but taken *alone* is not proof of fraud. 8 Wall. Sup. Ct. Rep., 370 ; 5 Wheat. Sup. Ct. Rep., 229 ; 5 Pet. Cond. Rep., 419 ; 2 Bro. Ch. Cases, 90 ; 5 Vesey, jr., 384 ; 1 Swanst. Rep., 106 ; 8 Vesey, jr., 199 ; 3 Barn. & Adol., 362.

In this last case it was held by the Judges " that a party must be *indebted* to the *extent of insolvency* to render his conveyance or gift fraudulent, within the statute of 13th Elizabeth."

The appellants contend that as Mrs. Berry, in whom the legal title was vested, was permitted to remain in undisputed possession for a long time after the death of Rowles, the partner of Berry, and to obtain credit upon the faith of being the *bona fide* owner, and judgments have been obtained against her estate and executions issued thereon and levied upon the property in controversy, a court of equity will not disturb the *rights and liens* thus acquired, and which have attached to the property, in aid of a creditor who has slumbered on his rights. 12 John. Rep., 553 ; 6 B. Monroe, 20.

*R. B. Hilton*, for Appellee.

At common law, chattels, personal of the wife at the time of marriage, or such as are given to her afterwards, becom

Alston vs. Rowles—Argument of Counsel.

the absolute property of the husband. This rule is applicable in this State to all such acquisitions anterior to 1845. Williams on Personal Property, 302; 8 Fla., 107. The earnings of the wife are in general the property of the husband. 1 Parsons on Contrts., 286; 2 Casey, 379; Story Eq. Jur., 387.

Where a purchase of property by a married woman is alleged in a contest with her husband's creditors, the burthen is on her to prove that she paid for it with funds which were not furnished by her husband. In the absence of clear proof that she paid for it with separate funds, the presumption is a violent one that the husband furnished the means for paying for it. 5 Fla., 278, 437; 8 Fla., 142; 9 Harr., 355; 18 Penn., —; 35 Penn., 375; 43 Penn., 363; 44 Penn., 307; 36 Penn., 410.

The purchase must be made with separate funds, with such funds as at common law did not become the property of the husband, in order to protect the property from the claims of the husband's creditors. Real estate purchased with the earnings of the wife's labor during coverture, is subject to claims of husband's creditors. She holds it as trustee for the husband's creditors. 15 Iowa, 502; 17 Iowa, 510; 24 Texas, 611.

There is no evidence to establish a separate property of Mrs. Berry in any property. The purchase money could therefore never have been separate funds.

The testimony of the witness, Flagg, and of H. H. Berry, is excepted to as clearly irrelevant. They undertake to say, in answer to a *leading* interrogatory to that effect, in which the word is put to their mouths, that Holbrook gave to Mrs. Berry "*separate*" property. This is of course a conclusion of law, and the interrogatory was objected to on that ground. Before the court can determine whether the property given was Mrs. Berry's *separate* property, it must know the terms and words of the gift. As Berry's debts had then been

9

wiped out by his discharge in bankruptcy, there was no reason why Holbrook should have conveyed property to Mrs. Berry, so as to make it "separate" property, for Berry then had no debts to which it could be subject. But inasmuch as there was no record of the property, it and its proceeds became of course subject to Berry's subsequent debts, even if given as his wife's separate property. (But I ask, was there ever before an effort made to establish a gift of separate property by parol proof of a parol gift?) Nor is there a scintilla of evidence that the hires of these slaves were applied to the purchase of the real estate in controversy. As it appears from the proof, that Berry and wife lived in considerable style, with their carriage and horses and driver, it must have required much more than the earnings of these slaves to support them in such extravagance.

It is impossible to maintain, under the proofs in the case, that R. H. Berry, at the date of either purchase, was in a condition to make a *valid* voluntary settlement upon his wife. His condition was that of permanent bankruptcy and insolvency. Flagg, one of the witnesses on the other side, says that he "knows that Berry had no means of his own with which to purchase property." In other words, that he was insolvent at the time of these purchases. The plantation, it will be remembered, was actually purchased after the death of Rowles, and after the accrual of Berry's indebtedness to him; and then bought on a credit. The town lots, though bought on the last day of the year 1853, were likewise bought on a long credit, and not paid for until after the death of Rowles. The mortgage to secure the purchase money was not satisfied until January 14, 1856, Rowles having died the previous fall. Johnson testifies actually that he was paid in part with goods from Berry's store. If so, he was paid after Rowles' death, for before that time the store was that of Berry & Rowles, not of Berry. Besides, we are bound to believe that as between two men, both of limited circumstances, like Berry and Rowles, the large in-

debtedness witnessed by the primissory notes given by Berry, to Mrs. Rowles, as executrix, and growing out of their co-partnership, could not have had its origin within the few months which elapsed between the date of the falling due of the first note to Johnson and the death of Rowles. The debt had probably been running up during the whole term, of the co-partnership. The money and goods which paid for both the town lots and the plantation were rightfully. the property of Rowles, and should have been applied to the payment of the debt due him. But inasmuch as they were not so applied, but were applied to the payment for the real estate bought in the name of Mrs. Berry, a court of. equity will so apply that property.

I feel therefore authorized in maintaining and asserting, with the utmost confidence, as alleged in the bill, not denied in the answers and conclusively established by the circumstances of the case, that this was a subsisting indebtedness at the date of the death of Rowles, and much of it doubtless accrued earlier.

But on legal principles it is impossible to escape this conclusion. Strictly and correctly speaking, as remarked by the Supreme Court of Georgia, in Hammond vs. Hammond, 20 Ga., p. 556, in a suit of one partner against another, after dissolution, for debt due growing out of the copartnership transactions, the claim was not so much for indebtedness due from one partner to the other, as for indebtedness from the *copartnership* to the *creditor partner*. This being so, how can it be contended that this indebtedness to Rowles accrued or could have accrued after the death of Rowles? Was it ever held or imagined that a copartnership could create or contract indebtedness after its dissolution?

Accordingly, it has been held in North Carolina, 6 Jones E., 124, (cited in U. S. Digest, vol. 19, p. 351,) that "Upon the death of one of the members of a copartnership, the statute of limitation begins to run in favor of his personal

representatives against a claim to have an account of profits received by him."

The judgment creditors of the wife in this case claim that even if it be admitted that the purchase money for this property was paid by the husband, yet their equity as creditors of the wife is equal at least to the equity of the creditors of the husband. The legal title they say being, during the whole time in the wife, they had a right to extend credit on the basis of that title; that they have at least an equal equity, and their diligence at law should not be rendered fruitless.

In reply: The property purchased in this case being paid for with the husband's money, who holds it as a trustee for her husband's creditors, (15 Iowa, 502,) her creditors can claim only such titles and interest therein as she herself had. The claim of the judgment creditor of the wife is subordinate to the claim of the creditors of the husband, whose trustee she is. 1 Am. Law Reg., 105; 11 Barb., 494; 1 Paige, 280; 4 Paige, 14; Adams Eq., 149; 2 Rich. Eq., 179; 10 Mich., 344; 1 Barr., 493; 2 Kan., 236; 15 Ark., 94; 2 Leading Cas. in Eq., 75; 7 Wall., 205; 1 Hare, 501; 3 Hare, 416, 424.

WESTCOTT, J., delivered the following opinion:

The property in dispute here is six hundred acres of land in Leon county and certain town lots in the City of Tallahassee. The conveyances to this property are in the name of the wife. Appellee, a creditor of the husband, claims that the consideration for the purchase of this property was the money of the husband; that her testator was a creditor of the husband at the time of the purchase or when the property was paid for by him; and that in either event, under the circumstances of the case, it should be declared assets in the hands of the husband's administrator, to be applied to the payment of his debts. The legal title to this

specific property was never in the husband. This, however, when considered with reference to the rights of the creditors of the husband as against the administrator of the wife, is not in all cases an answer to the demand of the creditor; if it were, the husband by this simple device would be enabled to settle upon his wife or his children the whole of his estate at the expense of his creditors. If this property was purchased with the funds of the husband, it is no sufficient answer to a creditor to say that it was conveyed to his wife. The general rule in equity is, that the property is as to his creditors, to the extent that he paid the purchase money, his property, for although it may be a *purchase*, and not strictly within the statute as to fraudulent conveyances, yet at common law, a person could not use funds which ought to be appropriated to his creditors in securing an estate for his wife or children. In such a case the creditor has a right in equity to follow the funds of the debtor. 1 Dev. & Bat., 569; 1 Ired., 559.

The first question therefore presented for our consideration is one of fact. Did the purchase money for this property proceed from the husband? Was it his? After a most careful consideration of the evidence in the record, it is our conclusion that nothing as to this point is established except that the husband paid the money for all of this property, alleging at the time that he paid the money, that it was his wife's, and that he made the purchase as the agent of his wife. The argument of the administrator of the wife and the creditor of the wife is, that it is established by the evidence that at the time of these payments she had separate property in the custody and control of the husband, which was more than sufficient to pay the purchase money, and that when this is the case, the declarations of the husband made at the time of the purchase to the effect that he purchased with her funds, together with the fact that the deed is in her name, should make a *prima facie* case in favor of those who claim through her. It will be unnecessary to state

the rule under these circumstances, unless the evidence discloses a separate property in the wife at this time.

It is in proof that the wife carried on a millinery business in her own name in 1844 or '45, and perhaps in the years 1846 and '47. This business the witnesses think was profitable. There is nothing in the record which connects the profits of this business with the purchase money. The purchase was made ten years after this business ceased, and only a part of the price was paid in cash. The amount of these earnings is not shown, nor does it appear that any of these moneys ever reached the hands of the husband. Our conclusion is that the evidence fails entirely to connect these earnings with the purchase money of this property. No question of law arises therefore in reference to them. It is unnecessary to determine whether the earnings of the wife under these circumstances remained her's, or whether they became her husband's. The only other source from which it is claimed that the wife derived a separate property was through a gift of personal property by Lowell Holbrook in 1841 or 1842. At this time the common law prevailed in this State. At common law the property of the wife was divided into two general classes : her general property, and her separate estate. The great difficulty in this matter is not as to the rules of law applicable to each class—they are well settled and defined. The difficulty is in determining to which class any particular piece of property may belong. The goods and personal chattels of the wife, which were actually beneficially possessed by her in her own right, at the time of her marriage, and such other goods and personal chattels as came to her during her coverture, belong to the first class, and these at common law vested absolutely in the husband. The separate property of the wife is that of which she has the exclusive control, independent of her husband, and the proceeds of which she may dispose of as she pleases. A gift of personal property during coverture to the wife is presumed, in the absence of testimony to the contrary, to be

a gift as her general property. Whenever it is separate estate, that character must be imparted to it by the instrument or title by which it is held, and in this case it devolves upon the parties who seek to establish a separate estate in a contest with the husband's creditors, to show that the gift was accompanied by some instrument or unequivacal declaration, to the effect that it was to and for her own separate use, free from the control of the husband. In the language of Judge Story, the purpose must clearly appear beyond any reasonable doubt, otherwise the husband will retain his ordinary legal and marital rights over it.

The witness, Berry, testifies that he knows that the slaves were bought by Mr. Holbrook and given to Mrs. Berry. The witness, Flagg, testifies that he knew the slaves were bought in the manner stated, and that Mr. Holbrook presented them to Mrs. Berry " as her own separate property." These answers are in response to this interrogatory: " Do you or not know that Mrs. Berry had a separate estate of her own in certain property, and if so, of what did it consist ?" Upon the cross-examination these witnesses are asked: " How do you know these slaves were the separate estate ?" The answer of one of the witnesses is: " I know that the slaves were bought by Mr. Holbrook and given to Mrs. Berry;" and the answer of the other is: " I know that Holbrook did not buy them to hold them, but only for the purpose of presenting them to Mrs. Berry. I know that the slaves were given to her, and supposed they remained her own separate property, as I never heard that she conveyed them to her husband or to any one else."

The direct examination seems to refer the question of law as to whether this was the general or separate estate of the wife to the witnesses, and their answer, that it was given as separate estate, is nothing more than an opinion of the witnesses upon a question of law, the witness at the same time saying nothing by which it is made to appear that the gift was accompanied by any instrument or unequivocal decla-

ration, to the effect that it was to and for the separate use of the wife, free from the control of the husband. Not only is this true, but the cross-examination discloses that these witnesses knew nothing more of the gift but the fact that it was made by Mr. Holbrook to Mrs. Berry as her property, and the facts they state are not such as show that it was free from the marital rights of the husband. The rule as to the evidence necessary to establish a separate property in the wife, so far as here involved, is very clearly stated in the case of Mews vs. Mews, 21 Eng. L. & E., 556, and in Quigly vs. Graham, 18 Ohio State, 46. The opinion of these witnesses upon a question of law amounts to nothing, especially when it is a question which has given rise to many nice distinctions and discriminations, both in England and the United States. In this State, the question whether a particular piece of property belongs to the general or separate estate of the wife has frequently come before the courts, and in this court has been the occasion of much difference of opinion. This property belonged to the husband and not to the wife, and the result is that the evidence fails to establish any separate estate in the wife at the time of the purchase of and payment for this property. With this view of the evidence, there is nothing left to sustain the hypothesis of a purchase with separate funds but the simple declaration of the husband, that he purchased the property for his wife and with her money. This is so clearly insufficient to establish a purchase with separate funds, that we deem it unnecessary to resort to a citation of authorities to sustain our conclusion. We will remark, however, that the careful examination which we have given shows that in most of the States a great degree of strictness prevails. The law prefers the claims of creditors to those of a wife, resulting from simple love and affection, and in carrying out this policy the courts are very strict, requiring in all cases that the right of the wife shall be made out by proof of the most unquestionable character. The result is, that this is a case where the hus-

band purchases, property taking the conveyance in the name of his wife.  As between the husband and the wife, under the circumstances, it must be regarded as a post-nuptial settlement, based upon the consideration of love and affection. It would never be held that a trust resulted to the husband; such was not the intention of the parties.  It is a gift to the wife.  10 Ves., 367.

We now reach the principal question in the case: Is this a voluntary post-nuptial settlement which can be sustained against the claim of the appellee, or is it a settlement made under such circumstances as requires a Court of Equity to set it aside, and declare the property subject to the claims of the creditor?

Appellee claims that her testator was a creditor at the time of the payments made by the husband for this property. It is unnecessary to state the rule applicable to such a case, until we determine whether she was a creditor.  Had this been a conveyance, would it have been void under the statute?  The language of the statute as to fraudulent conveyances is, that such deeds, made with the intent to hinder, delay or defraud "creditors or others of their just and lawful actions, suits, debts, accounts, damages, demands, penalties or forfeitures, shall be from henceforth as against the persons or body politic or corporate, his, her or their heirs, successors, executors, administrators and assigns, and every of them so intended to be delayed, &c., deemed, held, adjudged, and taken to be utterly void, frustrate, and of none effect."  Lord Mansfield has said of this statute, that it could not receive "too liberal a construction or be too much extended in suppression of fraud," (2 Cowp., 432,) and the courts both in England and the United States have given a most liberal construction to the term "creditors" in the statute.  The relation of creditor and debtor, within the meaning of this statute, has been assigned to cases in which there was nothing more than a contingent liability arising from express contract, and to cases where, at the time of the

conveyance, a present right of action did not exist in the party assailing the conveyance. A guarantor upon a covenant before breach of the covenants, a co-obligor before breach of the condition of the obligation, a guarantor before failure to comply with the contract, a surety as against a co-surety before default in payment by the principal—all of these are cases in which the liability arises from express contract, and are cases in which the parties are assigned the position of creditors for the purpose of setting aside voluntary conveyances. Whenever such a claim is reduced to judgment, the courts will not sustain a conveyance made between the execution of such contract and the time at which a right of action accrues, upon the ground that the liability was contingent. 27 Maine, 539; 8 N. H., 44; 18 John., 427; 4 Bibb, 165; 5 Cow., 67; 8 Cow., 429. We have a case of this kind in this State, and there is a case involving the same principle in the Supreme Court of the United States. (4 Fla., 223; 7 How., 229.) The Supreme Court of the United States in this case remark, that a contingent debt is both in principle and precedent enough to furnish a motive to make a fraudulent conveyance to hinder or avoid its ultimate payment, and this may be presumed to have been done, provided circumstances exist indicative of fraud. Admitting, for the sake of argument, that a person who would be entitled to the protection of the statute in the case of a conveyance, would be allowed to follow the funds in case of a purchase, I enquire: What are the precise facts as to the acquisition of the property and the indebtednes of the husband in this case?

The lots in Tallahassee were purchased in December, 1853. The bill alleges that the payments were made after the death of Rowles, which happened in the year 1855. The answers of the administrator of the wife and the administrator of the husband, (parties not having any personal knowledge of the matters alleged,) simply deny all the allegations of the bill. The proof is first a mortgage of the lots

Alston vs. Rowles—Opinion of Court.

to the original owner, (Johnson,) dated 31st Dec., 1853, executed by the husband and wife, and reciting a consideration of two thousand dollars. The mortgage deed is conditioned upon the payment of two promissory notes for the sum of one thousand dollars each, with interest from the first day of January, 1853 ; one payable on the first day of January, 1855. It will be noticed that the date at which the other note is payable is not disclosed, and that both notes bear interest from January, 1853. An entry of the satisfaction of this mortgage is made upon the records of the county of Leon on the 14th of January, 1856. The testimony of Johnson is the only other part of the proof having reference to this property. He does not recollect to whom the deed was made, or the price or the date of the sale. He says the lots were sold for cash, and that he took "a portion of the price in provisions from the store of Berry," but does not recollect anything about the dates at which payment was made.

As to the six hundred acres of land the proof is thus: There is a mortgage to E. Houstoun, adm'r, executed by the husband and wife in April, 1856, to secure a promissory note of that date, given by the husband, the wife, and J. H. Alston, for the sum of $2,008, payable January 1, 1857.

The witness, Houstoun, from whom this land was purchased, testifies, that a part of the purchase money was paid in cash, the balance in sundry payments, and that probably part of the amount was taken out in goods. We know nothing of the amount paid for this land beyond what is stated, nor can we ascertain with any certainty the date of payment. The land was paid for, however, and in the absence of testimony, the presumption is that the note was paid upon the first of January, 1857, when it became due. Having fixed the date at which the last payment was made, and stated all the evidence in reference to each purchase, it remains to determine whether Rowles or his executrix is shown by the testimony to occupy at this date the position

of an existing creditor. What is the evidence upon this subject? The notes given by Berry are dated the 8th of January, 1861. They represented an indebtedness from Berry to the estate of Rowles, which grew out of a partnership existing between them from 1850 to 1855. The partnership was dissolved in 1855 by the death of Rowles, and Berry, as surviving partner, controlled the business for the purpose of winding it up. The bill alleges, upon information and belief, that this indebtedness existed at the time of Rowles' death. The answer of the heirs at law and the creditors of the wife denies, upon information and belief, this allegation, and the answer of the legal representative of the husband and the wife deny it in general terms. The partnership business, the bill alleges, was profitable. Such is also the testimony of the witness Meginniss, who seems to have derived his information from a somewhat intimate knowledge of the business, and from a conversation with one of its members. There is a conflict in respect to this matter in the testimony of the witnesses, Flagg and Meginniss, but the case made by the bill agrees with the testimony of Meginniss, and a careful examination of his testimony, and a comparison of it with that of the other witness, shows that his knowledge of the entire transaction is greater, more definite and certain. This is all the testimony that has a bearing on the point. The substance of all may be briefly stated thus: A copartnership, which does a profitable business, is formed in 1850; it continues until 1855, when it is dissolved by the death of Rowles. Berry winds up the business as surviving partner, and in 1861 gives to the executrix of Rowles notes for $4,000. It is admitted that the indebtedness grew out of the partnership business. Do these facts make the executrix of the deceased partner a creditor of Berry in 1857, (the time at which the last payment was made,) a period four years before the date of the note? To prove this allegation devolves upon the complainant. A complainant seeking relief in a Court of Equity must, by

his evidence, produce that degree of certainty based upon appropriate evidence, either positive or circumstantial, which creates a moral conviction in the mind of the court that the facts are as he alleges, or he cannot have the relief he asks. This is the rule announced by this court on two occasions. 7 Fla., 144; 12 Fla., 388. It should certainly be applicable to this case, where the fact to be proved is to create a *prima facie* case of fraud. That the business was profitable would be a reason why there would be no necessity for either of the partners to owe each other, either during the copartnership or after dissolution. Berry, the surviving partner, was, at the date of the last payment, *simply in possession of the assets of the late firm, winding it up*. He continued in possession during four years afterwards, when the notes were given. The answer expressly affirms that there was no unnecessary delay on the part of the surviving partner in winding up the affairs of the copartnership and settling with complainant, *and denies upon information an indebtedness at the death of Rowles*. Berry might have been a creditor of the estate of Rowles in 1857 instead of its debtor, and such relation would *have been consistent with the answer, and not inconsistent with the evidence*. In an account stated between him and the representative of the deceased partner at this time, he would not have been chargeable with either the goods on hand or the assets of the firm in his hands, not converted to his own use. The legal title had simply survived to him; his duty was to apply the joint effects to the joint debts, and divide the surplus with the representative of the deceased partner. I cannot in this state of the pleadings and evidence presume an indebtedness at a given time from a possession of assets by a surviving partner at that time, and for four years afterwards. Suppose that Berry was in possession of these goods as a trustee, the conditions of the trust being similar to his legal duties as a surviving partner, would the proof of a debt arising from the trust, admitted by him in 1861, establish a violation of his trust in

1857? At the dissolution of the firm, for aught that appears, Rowles might have been indebted to Berry upon an account stated, and the indebtedness of Berry might not have accrued until 1859 or '60. It might readily have accrued then by his appropriating the whole of a collection, amounting to $8,000, and charging himself in his account as surviving partner with the whole of this sum. The representative of the partner Rowles could have had an account at any time after dissolution, and the court in this case would have afforded every facility in its power and known to its practice to have ascertained the date of this indebtedness. There has been a delay of over ten years from the dissolution of the firm and the date of the deeds.

The right to have an account upon dissolution is a common right. It belongs to the surviving partner, as well as the representative of the deceased partner. If this simple right, independent of the state of the account or the question of indebtedness, is something which makes a *prima facie* case of fraud at common law or under the statute, then neither party could make a purchase of property for a wife or child, or a voluntary conveyance; either of the parties may be a defendant to a bill for an account. Each of them has this equity; but upon which the liability rests, in order to make a voluntary settlement *prima facie* fraudulent under the statute, depends upon the state of the account, the question of actual indebtedness, and not upon the mere duty to account. The mere duty to account, independent of the question of indebtedness, cannot give a motive to defeat the claims of creditors. It is the indebtedness or liability, contingent or fixed, which, in contemplation of law, is the basis of the presumption of fraud. If a partner is liable, whether it be to a joint creditor or to his copartner, his liability is a fixed not a contingent liability, like that of a guarantor or endorser of a note, which last is a liability, whether the contract is performed by the maker of the note or not. Partnership is a simple confidential relation like

that of client and attorney, trustee and *cestui que* trust. The simple power which a partner has to draw more than his share, resulting from the custody of the joint property, cannot create a presumption of fraud. You must prove the act of drawing or the date of the indebtedness. When this is fixed, we have a motive sufficient to create a presumption of fraud. In the absence of such proof, no such presumption arises. The party here then becomes a subsequent creditor, and a subsequent indebtedness does not create a presumption of fraud in an antecedent voluntary settlement, and it certainly should not in case of a purchase.

There is no analogy between this case and the cases of contingent liability before alluded to, where the grantor is a covenantor, a co-obligor, a co-surety, an indorser, or guarantor. It would be carrying the doctrine to an unreasonable extent to hold, that proof of an admitted indebtedness by the surviving partner in 1861, established the existence of that debt in 1853, '54, '55 or '57, because of the fact that he had the custody of the goods as surviving partner from 1855 to 1861, and was a member of the firm from 1850 to 1855. An ordinary contract of copartnership is not one in which money is secured to be paid by one partner to another. The action is not brought upon this contract. That which creates the indebtedness is the act of drawing more than his share, and this is the date which should be established with reasonable certainty. In the contract of partnership, there is a mutual pledge of the skill and capital of the parties to carry on some business in which there is to be a community of interest, a division of the nett profits. If a liability accrues, it cannot be referred to the relation of copartners as the direct proximate and fundamental cause in the degree, and to the extent that the bond is the foundation of the liability in case of an obligor, or a note in the case of a co-surety, indorser or guarantor. (Roberts on Fraud. Con., 459, 461.) So in case of tort, the proof must

at least fix the date of the tort before the statute affects a conveyance by a tort feasor.

My conclusion in reference to this matter is, that the plaintiff has failed to show that her testator was a creditor of R. H. Berry in 1853, '54, '55 or '56 or '57, or that such circumstances are established as would create a presumption of fraud in the payment made for this property at that time, or would justify a Court of Equity in following and appropriating the funds. The position of the plaintiff is that of a subsequent creditor. A subsequent creditor in case of a purchase, it has been held, has not such equities as a subsequent creditor in case of a conveyance, (1 Dana, 547); but if in this case we should grant an equal equity to him, it would not, in my judgment, justify the decree.

The doctrine of the Supreme Court of the United States, as announced in the leading case of Sexton vs. Wheaton, (8 Wheat., 229), and as understood by Judge Story, is, that a voluntary conveyance made by a person not indebted at the time, in favor of his wife, cannot be impeached by subsequent creditors upon the mere ground of its being voluntary. It must be shown to be fraudulent in fact, or to be made with a view to future debts. There is nothing in this case to show that the settlement was made with a view to future debts. There is no actual fraud, no want of *bona fides* established. The evidence shows that in 1844 or '45, Berry took the benefit of the bankrupt act. That relieved him from debts then existing. Beyond the debts incurred for this property, and subsequently paid, the evidence fails to establish the existence of a single debt at the date of the deeds or the payments for this property, or at any subsequent time, except the debt of Rowles, and the business of the copartnership is admitted to have been profitable by the bill.

I agree with the conclusion of the court, that upon the hearing in the Circuit Court the injunction should have been dissolved and the bill dismissed.

RANDALL, C. J., delivered the following opinion:

While there is no difference among the members of the court as to the proper judgment to be given in this case, there is one position taken in the leading opinion in which I do not concur. That position is that the plaintiff, the executrix of John J. Rowles, did not stand in the attitude of a creditor of Berry, the surviving partner, upon the death of Rowles and the assumption by Berry of control of the partnership assets, in view of the duty and liability to pay the partnership debts, and to render to the estate of Rowles what it was entitled to upon final settlement, within the meaning of the statute relating to gifts or conveyances "made or executed, contrived or devised, of fraud, covin, collusion or guile, to the end, purpose or intent to delay, hinder or defraud creditors or others of their just and lawful actions," &c. And while it is conceded that the statute referred to does not control in the case at bar, and that the case must be governed by the principles of the common law, the question suggested may be elucidated by reference to adjudications upon the statute.

In my opinion, the estate of Rowles, from the date of his death, when Berry took possession of all the property and assets of the firm, and assumed and undertook to pay the partnership debts, and to account to and pay over to the representatives of Rowles whatever the interest of the estate might be in such effects whenever it should be ascertained, occupied the position of a creditor of Berry, and was one of those whom the statute in question was intended to protect against such gifts, conveyances or settlements as might have been made or contrived by the surviving partner, to the hindrance and damage of the representatives of the deceased partner, and that a voluntary conveyance or settlement by Berry upon his family, after he so became liable, was *prima facie* fraudulent as to the estate of Rowles.

10

Berry and Rowles were partners in mercantile business from 1851 to the death of Rowles in 1855. How much capital either of them put into the business does not appear. During a portion of the time, it is concluded from the evidence their business was prosperous. It does not appear that either of them was indebted or embarrassed during this time. Mrs. Berry carried on the business of a milliner and mantua-maker from 1844 to 1846 or 1847, and her business was understood to be prosperous; during which time Mr. Berry and his wife lived together. At the death of Rowles in 1855, Berry continued in possession of the partnership property and effects and assumed the settlement of the partnership affairs, and in January, 1861, made a settlement with the executrix of Rowles and gave her his five notes payable respectively from one to five years from date for the aggregate amount of four thousand dollars, and upon these notes the plaintiff's judgment was obtained. It is agreed by the pleadings that these notes were given for the amount found due from Berry as surviving partner to the estate of his deceased partner, and for a liability incurred in and growing out of the partnership business, the share of Rowles' representative in the net proceeds of the business.

It is not shown that any indebtedness accrued against Berry to the firm or to Rowles during the life time of Rowles.

At the time the partnership was thus dissolved, the survivor took possession of the joint effects, and thus became at once liable to account to the executrix of Rowles for the value of whatever share or interest the latter had in the assets at the time of his death, over and above the copartnership debts; and such liability was not in the nature of a contingent, but a fixed, subsisting, present liability, a ground of action; and if a bill had been at once filed for the purpose of winding up the affairs of the late firm, a court of equity would have directed an account and made a decree for whatever amount was found due the plaintiff after satis-

fying the partnership debts and reducing the assets to money. If there had been no valuable assets in the hands of the survivor, or if Berry was not in arrears at the time of Rowles' death, the indebtedness, for which the notes were given, had not existed and the notes would not have been given. The liability arose out of contract. It was a liability to pay money, the amount not being ascertained until the notes were given, and when they were given the amount was found to be four thousand dollars, as acknowledged by Berry in the giving of his notes. The foundation, the fundamental basis of the indebtedness, as thus finally ascertained, existed at the moment Berry assumed the liquidation of the affairs involved in the partnership out of its effects in his possession ; and I think that in the absence of any proofs showing grounds for a different conclusion, the liability to pay existed at the death of the partner and the assumption and possession by the survivor of the effects of the firm. Presumptions grow from facts, and from the only facts shown in the present case, I regard this conclusion as legitimate. If it is suggested that the assets may have been in part composed of desperate debts due to the firm, which could not be charged to Berry until they were collected, I can only reply that when these, if any such, were collected, the avails were not paid to the plaintiff nor absorbed in paying partnership debts. But the money must have been at some period realized, and it is equally legitimate to infer that the assets were entirely cash, or in goods convertible immediately into cash, on the moment of the dissolution, and that the sum of four thousand dollars was the amount which had become due, including interest, at the giving of the notes.

If the surviving partner was a trustee of the partnership effects, I cannot yet discover that this would take the case out of the statute ; for if a trustee makes voluntary gifts or conveyances to his family, or confidential friends, to the hindrance of creditors *and others*, it is in my judgment one

of the very purposes of the statute to protect the *cestui que trust* in such cases. But in this case, in the state of the pleadings and proofs as presented, I think the relation of the executrix is that of a creditor, from the date of the death of her testator, of the surviving partner.

In the case of Jackson vs. Seward, (5 Cow., 67,) a judgment was recovered against William Seward in 1820, the suit having been commenced in 1819, upon a covenant of guarantee dated before the deed, to-wit: in 1817, and the defendant had conveyed his property by deed in 1818. The court held, upon authority, that " the guarantee stood in a relation to William Seward, the guarantor, which entitled him to the protection of the statute. * * For our statute for the prevention of frauds is not confined to creditors only, but it avoids all conveyances, &c., devised and contrived with the purpose and intent to delay, hinder or defraud creditors and others of their just actions, &c. * * The question of creditor or not cannot turn on the ground of contingent liability, when considering this act. If it should, all indorsers and sureties would be deprived of its protection. It was said in Twyne's case, (3 Rep., 82,) and reiterated by the court in Jackson vs. Myers, (18 Johns.,) that the statute extends not only to creditors, but to all others who had cause of action or suit, or any penalty or forfeiture. And it has always been held that the statute was entitled to a liberal construction for the suppression of fraud. The demand in this case, *fundamentally*, (as expressed by Roberts on Fraudulent Conveyances, 459,) arose before the conveyance. It arose upon a covenant, prior in date to the conveyance, for the performance of a collateral, and, if you please, contingent act. But it cannot be said that the covenantor was ignorant of his liability so as to exempt him from the imputation of fraud, under the statute, if he has made a voluntary conveyance."

Mr. Senator Spencer, in the leading opinion in the Court of Errors upon the same case, remarks : " I am of opinion

that Van Wyck, the lessor of the plaintiff, was a creditor at the time of the conveyance by William Seward to his son, and I am satisfied with the reasoning of Justice Sutherland on that point."

Standing *in the relation* of a creditor of Berry, as I conceive the executrix of Rowles to have stood, upon the facts disclosed in this case, a voluntary settlement by Berry upon his wife of the property described in the bill was presumptively fraudulent as to the demand of the complainant; and unless it appears that Berry, at the time he purchased and paid for this property, had abundant means left in his possession which might have been subjected to the payment of this debt, thus overcoming and rebutting the presumption of fraud, this property should be subjected to the payment of the plaintiff's judgment. The fraudulent intent in such a case is a presumption arising from the fact that a voluntary conveyance or settlement is made when the grantor or donor is indebted, and that his circumstances are such that the conveyance or gift endangers the security of the creditor.

The Supreme Court of the United States, in Hinde's lessee vs. Longworth, (11 Wheat., 199,) held that a deed from a parent to a child for the consideration of love and affection is not absolutely void as to creditors. It may be so under certain circumstances; but the mere fact of being indebted would not make the deed fraudulent if it could be shown that the grantor was in prosperous circumstances and unembarrassed, and that the gift to the child was a reasonable provision, according to his estate and condition in life, and leaving enough for the payment of the debts of the grantor. The want of a valuable consideration may be a badge of fraud, but it is only presumptive and not conclusive evidence of it. This agrees with the doctrine of Lord Mansfield in Cadogan vs. Kennett, (Cowper, 434,) and in Doe vs. Rutledge, (*ib.*, 705,) where the question was between a purchaser and a party claiming under a settlement.

He said the statute does not say a voluntary settlement shall be void, but a fraudulent settlement shall be void.

The rule in such cases as declared in the case of Hinde's lessee vs. Longworth, above quoted, appears to have been generally adopted by the courts in this country.

I have thus far considered the effect of the statute because of the course of the argument, and because the general doctrines involved are properly applicable to the question discussed.

There is no principle better settled than this : that where a party indebted purchases and pays his own money for property, taking the title thereto in the name of a third person, with the intent to delay, hinder or defraud his creditors, a trust results in favor of creditors, and the property so acquired may be reached by the creditor, at least to the extent of the funds of the debtor invested in it.   1 Cruise's Dig., tit. xii, chap. 1, sec. 48 ; 1 Atk., 59 ; 2 ib., 71 ; 2 Ves. & Beame, 388 ;  4 East, 577 ;  7 Cranch, 176 ;  19 Wend., 414 ;  2 Johns. Ch. R., 405 ; 15 N. Y., 475.

There can be no question in this case that the lands in controversy were contracted for and paid for by R. H. Berry, the surviving partner, and the titles thereof taken in the name of Mrs. Berry.

It may well be, as was insisted by the appellants, that the money thus invested was earned or accumulated by Mrs. Berry, as the result of her own industry and enterprise, but if that were so, it was still lawfully the money and property of the husband.

But there were some ten or more slaves given to Mrs. Berry by one Holbrook, who bought them at the bankruptcy sale of Berry's effects in 1841 or 1842, (and some increase after the gift) ; but these slaves, as was well urged by respondent's counsel, became at once the property of Berry, by force of the common law.   And then there were a carriage, and horses, and silver plate, &c., all the lawful property of Mr. Berry ; and the testimony of H. H. Berry and

of Mr. Flagg goes to show that there was an abundance of valuable property in the possession of Berry before, and at the time of, and subsequent to the death of Rowles, other than partnership property, of sufficient value to pay for the property purchased in the name of Mrs. Berry; and also to pay all Berry's debts and liabilities, including that to the estate of Rowles.

The slaves mentioned " remained with Mrs. Berry during her life," and were, with other property, during the lifetime of Berry, and long afterwards, liable to be subjected to the payment of his debts. All this property was acquired, it is said, by or in the name of Mrs. Berry; but it does not appear that it was in any manner secured to her as her "separate property."

Under these circumstances, it does not appear that the purchase of the real estate was made with the purpose or intent to hinder, delay or defraud creditors; nor that it was in Berry's circumstances an unreasonable post-nuptial provision.

It does not appear, that at the time of the purchase, Berry was embarrassed with *debts;* and it does appear that he was possessed of enough property, after the payment of the purchase money, to pay the claim now presented, and much more, thus rebutting every *presumption* of fraud in that transaction. The presumption of fraud arises where one being indebted makes a voluntary conveyance or disposition of his property; but it is only a presumption or argument of fraud, and is overcome by evidence showing that abundant security remained in the possession of the grantor to satisfy the indebtedness. This is the spirit of the modern decisions. The rule of Lord Hardwicke, and later, that announced by Chancellor Kent, that no circumstances could remove or obviate this presumption, is no longer the prevailing doctrine in England or America.

The fact that, with the close of the late war, all property in slaves was destroyed and lost, cannot affect the question,

however unfortunate may have been the effect upon the remedy of creditors against the owners of such property. It certainly cannot bear upon the question of the fraudulent disposition of the property of Mr. Berry in 1855 and 1856.

There is another matter which, unexplained, has an important bearing upon this controversy. The liability of Berry was incurred about the close of the year 1855. The plaintiff, for six years, appears to have taken no steps towards enforcing this claim, and meantime, she must have been aware, as it seems the public was well advised of the purchase in the name of Mrs. Berry of the lots from Johnson and the plantation from Col. Houstoun. Yet, in January, 1861, Mrs. Rowles, the executrix, instead of pursuing the available property of Berry, or even then endeavoring to subject this land, as now attempted, to the payment of her demand, took Berry's notes, unsecured, and gave a long time for their payment; meantime, Mrs. Berry, holding the title to this property, and procured credit, perhaps upon the faith of her title, which the plaintiff had declined to attack.

Had the plaintiff any reason to believe or suspect in 1861, or prior to that time, that the purchase of the real estate was fraudulent on the part of Berry, it was extraordinary that she did not insist upon prompt payment, or take prompt measures to secure her claim, instead of extending the credit for five years, without security. Yet she did this, and so must have had faith in his ability to pay and in his integrity. It is shown by the testimony, that the purchase of the land was notorious, and that the purchase of the plantation was at public auction, during the year following the death of Mr. Rowles. Eight or ten years elapsed after this, during which time this prosecution was, it is presumed, voluntarily deferred, while Mrs. Berry was the legal owner of the lands, and the world had a legitimate right to treat with her and extend a pecuniary credit to her on account of her title. The long delay of the plaintiff in the attempt to subject this property to the payment of her demand is an important circumstance, not

only with reference to the charge from that quarter of a fraud on the part of Mr. Berry, but also in considering the legal rights of the judgment creditor of Mrs. Berry here. If it was apparent that the title of Mrs. Berry was a mere trust estate, doubtless the claims of the *cestui que trust* or his creditors would not be prejudiced by an apparent judgment lien against the legal title of the trustee. But in no sense can it be said that Mrs. Berry was a trustee of her husband, in view of the statute which declares that no trust in lands shall be created except by writing, save such trusts as may result by implication or construction of law. The trust here, if it may be called a trust, must have been in favor of creditors, arising out of the right of creditors to follow the funds of their debtor in proper cases. But it is unnecessary to pursue this question, in view of the conclusion already announced upon the question of the fraudulent intentions of Mr. Berry in the purchase of the property in controversy.

If the lien of the judgment creditors of Mrs. Berry can be entitled to any favor, however, even upon the assumption that the plaintiff might have been entitled to relief as against Mrs. Berry, most certainly her creditors would be entitled to favorable consideration in this case, in view of the fact that the plaintiff has not exercised that diligence that might have been expected from a creditor in her position in prosecuting her supposed remedy.

The decree of the Circuit Court should be reversed and the bill dismissed.

HART, J., delivered the following opinion :

There was property enough besides the plantation and the house in town, liable for Berry's debt, to have paid it, and time enough in which to have realized the amount out of that property, without touching the plantation and house; and therefore the taking of the conveyances in the name of Berry's wife was not an act fraudulent as to this creditor of his.

The partnership effects became the property of the survivor in trust, &c., who thus became liable to the estate of the deceased partner, to the amount of its share of the nett value, afterwards ascertained to be $4000. There is no evidence to prove that this amount was, in whole or in part, made up by the diligent collection of doubtful debts due the partnership ; nothing to show that the survivor had assumed only a contingent liability. From all that appears, it was a positive liability for a sum that could have been definitely ascertained at any time by Berry, or by a Master in Chancery. Had the administrator of the deceased partner been vigilant, it would have been done in due time, and this suit been prevented. What was the law of the case then, is now. The facts have, in the neglect of years, changed. Then this debt could have been collected out of other property than that which had been deeded to Mrs. Berry. Then those deeds were valid. Now, that other property has disappeared. The deeds are valid still. The neglect of the creditor has not changed the law by which they were then valid.

The judgment of the court is, that the decree in this cause is reversed, and the case is remanded to the Circuit Court of Leon county, for such further proceedings as are consistent with the views expressed by the majority of the court in the opinions herein rendered, and the principles of equity.

A petition for rehearing was filed in this case. The rehearing was denied by the court.