JERRY GALATIS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 10747.    Promulgated September 22, 1927.

1. Petitioner's income for the year 1919 arising from a sale and reacquisition of certain interests in a restaurant business, and the operations of that business determined.

2. The evidence shows that property owned in 1919 by petitioner's wife was her separate property and that the profit realized upon the sale was her separate income.

*Douglas D. Felix, Esq.*, for the petitioner.
*A. R. Marrs, Esq.*, for the respondent.

This proceeding involves redetermination of deficiency in income tax for the year 1919, in the amount of $7,699.94. This deficiency arises from the determination by the respondent that the petitioner received additional income in the sum of $21,599.20 by reason of certain transactions in connection with the business known as Rector's Cafe, and from a net gain arising from the sale of certain real estate.

FINDINGS OF FACT.

The petitioner is an American citizen, and resides at Miami, Fla. Julia Galatis, sometimes referred to herein, is the wife of the petitioner.

In 1913 the petitioner and his wife, Julia Galatis, and his brother, Peter Galatis, opened a restaurant in Miami, Fla., under the name of Rector's Cafe. All books pertaining to Rector's Cafe for the year 1919 and preceding years have been lost. The petitioner in his return for 1919 returned no income arising from this cafe or any transactions pertaining thereto. The petitioner contributed only his services to the enterprise. Mrs. Galatis contributed her services and about $500 in cash, which arose from her pledging her jewelry. Peter Galatis contributed his services and a few hundred dollars. The profits were divided, 40 per cent to Peter Galatis and 60 per cent to Jerry Galatis and Julia Galatis in equal shares. Jerry Galatis purchased the interest of Peter Galatis in 1917 and thereafter he and his wife ran the business together. In the early part of 1918 Jerry Galatis, being desirous of going into the business of buying and selling real estate and not desiring to give his whole time to the cafe, requested his brother Peter Galatis to procure other persons who would purchase his (Jerry Galatis') interest in the cafe. At this time petitioner had a four-fifths interest in the cafe and his wife, Julia, a one-fifth interest. Peter Galatis thereupon procured as purchasers Nick Hantges, Tom Poppas, and Peter Gotsis. These three, together with Peter Galatis, each bought a one-fifth interest in the cafe. None of these paid any money for his interest except Peter Gotsis, who paid $800; the four named agreed to work for the cafe for five years and to pay the purchase price for their respective interests out of the profits of the cafe. The purchase price of each one-fifth share was $3,600. Each of the four was to receive as drawing account for personal expenses $75 a month. Jerry Galatis was to act as manager and to receive for his salary $2,100 per annum. As manager he had control and possession of all books and complete management of the business. The books of the cafe were kept by H. B. Graham. On them there was set up the share of each member, including that of Julia Galatis, and the amount of net profits due each.

From the beginning in 1913 to and including the year 1919 Julia Galatis contributed her services, working nearly all of the days and evenings as well.

At the end of 1918 there had accumulated to the account of Nick Hantges, Tom Poppas, and Peter Gotsis $7,500, being their share of the profits for the year ending December 31, 1918. This amount was on December 31, 1918, credited to these persons and turned over to

the petitioner in part payment of the purchase price of the cafe. Some time in 1918, the exact date not being shown, Peter Galatis sold his share to Charles Bassis.  On March 31, 1919, petitioner repossessed himself of the one-fifth interest which he had sold to Peter Gotsis.  On November 9, 1919, he repossessed himself of the one-fifth interest which Peter Galatis had sold to Charles Bassis, and on November 25, 1919, he repossessed himself of the one-fifth interests sold to Nick Hantges and Tom Poppas, respectively.

In consideration of the repossession by petitioner of the four-fifths interest which was owned by Gotsis, Bassis, Hantges, and Poppas, he paid them a total sum of $11,600 out of the net profits of the cafe which had been accrued on the books to Gotsis, Bassis, Hantges, and Poppas as their respective distributive share of the profits of the business to that date.  It does not appear how much he paid each one.  There is nothing in the record which indicates that the cafe was less valuable when repossessed than when the four-fifths interest was sold, nor does the record disclose that the petitioner made any gain by reason of the sale early in 1918 to the new members.

The amount paid in salaries by the cafe during the year 1919 was $4,620.  The respondent has allowed as deduction for salaries $3,350. The petitioner is entitled to a further deduction in the sum of $1,270.

The respondent has determined that the petitioner's income for the year 1919 from the cafe was $24,344.18.  He has arrived at this computation in the following manner:

1. Income accruing from the cafe in 1918:

| | |
|---|---:|
| Nick Hantges | $2,500 |
| Tom Poppas | 2,500 |
| Peter Gotsis | 2,500 |
| Total | $7,500.00 |

| | |
|---|---:|
| 2. Profit accruing to petitioner in 1919 upon repossession by him of the interests of Nick Hantges, Tom Poppas, Peter Gotsis and Charles Bassis | 4,996.92 |
| 3. Share of income of cafe, of Julia Galatis, who respondent held was not a partner, transferred to account of Jerry Galatis | 7,832.28 |
| 4. Changes in net income of cafe by way of adjustment of partners' salary account | 1,270.00 |
| 5. Reallocation of income account accrued to Nick Hantges, Tom Poppas, Peter Galatis and Charles Bassis to date of repossession of their interests by Jerry Galatis | 2,744.98 |
| Total | 24,344.18 |

Item 5 is not contested by the petitioner.

Item 4 should be eliminated since the amount of salaries paid by the cafe as found above was $4,620.

The amount paid by petitioner out of the 1919 net income of the cafe to the owners of the interests which he repossessed in that year was $4,100, being $11,600 less the $7,500 which accrued in 1918 to

Hantges, Poppas, and Gotsis, which Jerry Galatis retained. The cafe earned net income for the year 1919 in the amount of $19,674.18. This amount is arrived at as follows:

| | |
|---|---:|
| Net profits to petitioner in repossessing the shares, as above set forth_ | $4, 996. 92 |
| Amount paid by petitioner out of 1919 profits_____ | 4, 100. 00 |
| Income transferred from account of Julia Galatis_____ | 7, 832. 28 |
| Reallocation of income accrued to various partners as above set forth_ | 2, 744. 98 |
| | 19, 674. 18 |

Of this amount one-fifth, or $3,934.83, was the income derived by Julia Galatis from her one-fifth interest. The remaining $15,739.35 was realized by petitioner either by reason of his repossession or by reason of his being a part owner of the cafe subsequent to the acquisition of the various shares. By reason of his repossession and by reason of being a part owner of the cafe after repossession of each interest, the petitioner came into possession of the $7,500 which belonged to the share of Hantges, Poppas and Gotsis in 1918, and four-fifths of the profits arising in the year 1919, to wit, $15,739.35, making a total of $23,239.35. Of this amount he repaid $11,600, making his net income for 1919 from the cafe $11,639.35.

By general warranty deed dated May 23, 1918, Zelma B. Jones and her husband, Edwin M. Jones, conveyed to Julia Galatis the west 50 feet of lot 4, and all of lots 5 and 6 of Block 3 north, in the City of Miami. On May 1, 1919, Tatum Bros. Real Estate & Investment Co., a corporation, executed and delivered to Julia Galatis a deed, the material parts of which read:

THIS INDENTURE, Made this 1st day of May, A. D. 1919, BETWEEN TATUM BROS. REAL ESTATE & INVESTMENT COMPANY, a corporation organized and existing under and by virtue of the laws of the State of Florida, having its principal place of business in the County of Dade, in the State of Florida, party of the first part, and JULIA GALATIS of the County of Dade, in the State of Florida, party of the second part,

WITNESSETH, That the said party of the first part, for and in consideration of the sum of Ten ($10.00) Dollars and other valuable consideration, to it in hand paid by the said party of the second part, the receipt whereof is hereby acknowledged, has granted, bargained and sold to the said party of the second part, her heirs and assigns forever, all that certain parcel of land lying and being in the County of Dade, State of Florida, more particularly described as follows:

Lot Eight (8) of Block One Hundred Seventeen (117) North, City of Miami, Florida, as per plat or map of said City made by A. L. Knowlton, C. E., and on file in the office of the Clerk of the Circuit Court, in and for Dade County, Florida.

This deed is given with the understanding that the Grantee assumes a mortgage which was given by the Grantor to Miami Savings Bank and E. C. Romph, as Trustee, and due in three years from February 1st, 1917, and drawing interest at the rate of 6% per annum, which said mortgage was filed March 6, 1917 in Mortgage Book 71, page 34, in the sum of $35,000.00 and of which there has been paid $12,000.00 and interest to May 1st, 1917.

The Grantee assumes the taxes from May 1st, 1919.

The consideration for this transfer was $48,000 made up as follows: Julia Galatis traded in the lots which she had acquired from Zelma B. Jones and her husband, at an agreed price of $14,000, assumed a mortgage of $23,000 and paid the balance in money which was furnished either by Julia Galatis or her husband, Jerry Galatis. Lot 8, block 117, acquired by Julia Galatis from the Tatum Bros. Real Estate and Investment Co., and the west half of lot 13 and the east half of lot 12 and south 50 feet of lot 9, block 113, theretofore acquired by her husband, Jerry Galatis, were conveyed on September 30, 1919, by deed to Thomas J. Peters, the material part of which follows:

THIS INDENTURE, Made this 30th day of September, A. D. 1919, BETWEEN Jerry Galatis and Julia Galatis, his wife, of the County of Dade, in the State of Florida, parties of the first part, and Thomas J. Peters of the County of Dade, in the State of Florida, party of the second part.

WITNESSETH, That the said parties of the first part, for and in consideration of the sum of Ten Thousand ($10,000.00) Dollars and other good and valuable considerations to them in hand paid by the party of the second part, the receipt whereof is hereby acknowledged, have granted, bargained and sold to the said party of the second part, his heirs and assigns, forever, the following described land, situate, lying and being in the County of Dade and State of Florida, to-wit:

The West half (W 1/2) of Lot Thirteen (13) and the east half (E 1/2) of Lot Twelve (12) and all of Lot Eight (8) and the south fifty feet (S 50 ft.) of Lot Nine (9) all of Block One Hundred and Seventeen North (Blk. 117 N.) City of Miami, Florida, as per plat or map made by A. L. Knowlton, C. E. on file in the office of the Clerk of the Circuit Court, Dade County, State of Florida, and therein recorded in Book " B " of plats at page forty-one (41).

The above deed conveyed the west half of lot 13 and the east half of lot 12 and the south 50 feet of lot 9, all in block 117, north, which lots were the property of Jerry Galatis. The consideration for this transfer was $60,000 cash, and 14 notes secured by first mortgage, each for the sum of $10,000 and payable annually over 14 years. In the conveyance to Peters the lots belonging to Jerry Galatis were valued at $130,000, and the lots belonging to Julia Galatis were valued at $70,000. The mortgage for the unpaid purchase price of $140,000 was executed to Jerry Galatis alone. This was done in order to enable him to pay off the liens on the property. It was the understanding between Jerry Galatis and his wife that he was to repay her all that was due her by reason of the sale to Peters after the payment of all liens on the property. The cost of lot 8, block 117, sold to Peters by Julia Galatis was $48,000, and the gain realized by her in the sale was $22,000.

#### OPINION.

LITTLETON: The record presents considerable difficulty in arriving at the net income resulting from the operation of the cafe for the

year 1919. From all the evidence we conclude that the income for 1919 was $19,674.18, as set out in the findings of fact. The only criterion to be found in the record, other than that adopted by us, by which this income may be estimated, is the return of Julia Galatis to the effect that she received $7,832.28 as her share of the net income, and her testimony that she owned a one-fifth interest in the cafe. If this be true, the net income of all persons derived from the cafe was $39,164.40, an amount far beyond the estimate of either party to this proceeding. Standing alone and without other support, that hypothesis has been rejected.

The transactions in 1919 between the petitioner on the one side and Gotsis, Bassis, Hantges, and Poppas on the other, resulted in the petitioner reacquiring all the interests in the cafe which he had transferred to them in 1918. So far as the record discloses, the cafe was in as good condition when the petitioner reacquired possession of those interests as when he parted with them. In addition to reacquiring all that he had sold, the petitioner had in his possession $7,500 (the profits remaining over from 1918) and all the profits belonging to Gotsis, Bassis, Hantges, and Poppas for the year 1919. The books have been lost and it is impossible now to determine the amount of profits which belonged to any one of the four vendees at the time he retransferred his interest to the petitioner. It is sufficient to say that all of the profits resulting during the year 1919 from the four-fifths interest reacquired by the petitioner in 1919 were retained by him. The result of this is that by reason of the reacquisition of the interests which he had transferred to Gotsis, Bassis, Hantges and Poppas, at the close of 1919, the petitioner had received back all that he had sold, and had also received $7,500, representing the distributive share upon these interests of the net profits earned for the year 1918, plus $23,-239.35, the distributive share upon the same interests of the net profits for 1919, less $11,600 which he had returned to his various vendees, leaving in his hands a net gain of $11,639.35. This amount of $11,639.35 was not an asset which had to be transmuted into money in order to ascertain gain, but was cash itself. This amount was not a gift by these vendees to the petitioner. It was gain to him by reason of transactions which took place in the year 1919.

The next question is, what interest did Julia Galatis have in this cafe? It is shown that in 1913 she pledged jewelry which she stated was her own property and borrowed $500 which she invested in the cafe. How she acquired this jewelry does not fully appear, but upon the record it is our opinion that it was her separate estate under the laws of Florida.

The laws of Florida relative to a married woman's separate estate are to be found in section 1 of Article XI of the Constitution of Florida, and in section 3947 of the Revised General Statutes of Flor-

ida.   Section 3947 need not be quoted as it practically paraphrases section 1, Article XI of the Constitution, which is as follows:

All property, real and personal, of a wife owned by her before marriage, or lawfully acquired afterwards by gift, devise, bequest, descent, or purchase, shall be her separate property, and the same shall not be liable for the debts of her husband without her consent given by some instrument in writing, executed according to the law respecting conveyances by married women.

The right of a married woman to her separate property is treated at length in *Florida Citrus Exchange* v. *Grisham*, 65 Fla. 46; 61 So. 123, where it is said:

Under the act of March 6, 1845, brought forward in the General Statutes as section 2589, " the property of the wife shall remain in care and management of the husband, but he shall not charge for his care and management, nor shall the wife be entitled to sue her husband for the rent, hire, issues, proceeds or profits of her said property." The contention of the plaintiff in error might be sound, were it not for the provision of the Constitution of 1885, art. 11, 1, declaring that " all property, real and personal, of a wife owned by her before marriage, or lawfully acquired afterwards by gift, devise, bequest, descent, or purchase, shall be her separate property, and the same shall not be liable for the debts of her husband without her consent given by some instrument in writing, executed according to the law respecting conveyances by married women."

The Constitution has thus vested her with the *property* in her separate estate, instead of the mere *title* thereto, which only she enjoyed prior to the Constitution of 1868, of which our present Constitution is an amendment. May the Legislature, against the will of the wife, say to her that the husband shall have absolute dominion over her " property"? To so hold, it seems to us, would cut down the larger word " property " to the narrow word " title," and say to the makers of the Constitution: " You were ignorant of the meanings of the two words; the change you made was a thoughtless one, and we shall again enthrall the wife, however skillful and competent she may be in matters financial, under the yoke of the husband, however incompetent in such matters, or controlled by his appetite for strong drink or gambling, or other dissipations."

The limit the Legislature can go in this direction is to make the husband the agent of the wife as to her separate property, confirmed in her by the organic law, only so long as it may be mutually agreeable, the husband serving without compensation; but the Legislature may not interfere with her dominion over that property, created and fixed in her by the higher law, to the extent of placing it irrevocably in the control of her husband.

A married woman can not enter into a partnership agreement so as to render herself liable as a partner. *De Graum* v. *Jones*, 23 Fla. 83; 6 So. 925; *Virginia-Carolina Chemical Co.* v. *Fisher*, 58 Fla. 377; 50 So. 504. On the other hand, a married woman may invest her separate estate in a commercial enterprise and the resulting property is her separate estate. She may compel an accounting. *Porter* v. *Taylor*, 64 Fla. 100; 59 So. 400. She may bargain for an interest in a commercial concern in consideration of her services and after the services have been rendered, compel specific performance. *Le Noir* v. *McDaniel*, 80 Fla. 500; 86 So. 435.

11340°—28——17

From the above authorities it appears that while Julia Galatis was not a partner and could not become a partner in the cafe, nevertheless she could acquire an interest in the cafe which would be her separate property, to the extent that she would be entitled to her share of the net earnings of the cafe.

The manner in which the interest of Julia Galatis was reduced on March 1, 1918, from a 30 per cent interest to a 20 per cent interest does not appear. It does not appear whether she acquired this one-fifth interest in consideration of her interest in the busin...ss as it existed before the new members were taken in, or whether her husband acquired her interest and gave it to her. Under the laws of Florida the husband can make a gift of personal property to his wife. See *Garner* v. *Bemis*, 81 Fla. 60; 87 So. 426; *Keyser* v. *Milton* (C. C. A.) 228 Fed. 594. Irrespective of how she acquired her one-fifth interest, the evidence clearly shows that Julia Galatis did own such an interest in the cafe after March 1, 1918. It was set apart to her on the books of the company and her interest was scrupulously kept separate from that of her husband. All this was done with the knowledge and consent of her husband and of the other members.

Lot 8 C 117 conveyed by Julia Galatis and her husband to Thomas J. Peters on September 30, 1918, had theretofore been conveyed to her by the Tatum Bros. Real Estate & Investment Co. It was, therefore, property acquired by Julia Galatis either by "gift" or "purchase" as those words are used in section 1 of Article XI of the Constitution of Florida, and was, therefore, her separate property. For the purpose of this opinion, it is immaterial whether Julia Galatis paid all the purchase price or whether part of it was paid by the petitioner. If she paid the whole, then, undoubtedly, it was her separate estate since she acquired it by purchase. If the petitioner paid part, then she acquired so much as he paid for as a gift. A case very similar to this is *Alston* v. *Rowles*, 13 Fla. 117. That case involved the right of creditors, a question not involved in this proceeding. There it was contended by the wife that a lot which was conveyed to her was purchased entirely out of her own funds. The court held that this was not the fact, but said:

> The result is, that this is a case where the husband purchases property taking the conveyance in the name of his wife. As between the husband and the wife, under the circumstances, it must be regarded as a post-nuptial settlement, based upon the consideration of love and affection. It would never be held that a trust resulted to the husband; such was not the intention of the parties. It is a gift to the wife. 10 Ves., 367.

We are constrained to hold, therefore, that lot 8, block 117, conveyed by Julia Galatis in conjunction with her husband to Thomas J.

Peters, was her separate estate and that the proceeds of such sale ($70,000) belonged to her. The fact that the mortgage for the purchase price was taken in the name of petitioner is immaterial since it was agreed between the petitioner and his wife that he would account to her for her share of the proceeds. In *Booth* v. *Lenox*, 45 Fla. 191; 34 So. 566, the Supreme Court of Florida held that where a husband had conveyed his wife's separate estate without her knowledge and converted the proceeds to his own use, the facts created a resulting trust in her favor which could be established by parol testimony. If a trust can be established by parol testimony under the circumstances of that case, it follows that a trust created by express agreement can be established by such evidence. On this point the respondent erred in attributing to the petitioner the profits which arose from the sale of his wife's lot to Peters.

Reviewed by the Board.

*Judgment will be entered on 15 days' notice, under Rule 50.*